# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-2987

_____

| | | |
|---|---|---|
| North Star Steel Company, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| MidAmerican Energy Holdings | * | Southern District of Iowa |
| Company;  MidAmerican Energy | * | |
| Company, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  April 22, 1999

Filed:  July 7, 1999

_____

Before McMILLIAN, LOKEN and MURPHY, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

North Star Steel Co. (North Star) appeals from a final order of the United States District Court[1] for the Southern District of Iowa granting summary judgment in favor of MidAmerican Energy Co. and its parent corporation MidAmerican Energy

_____

[1]The Honorable Charles R. Wolle, Chief Judge, United States District Court for the Southern District of Iowa.

Holdings Co. (collectively referred to as MidAmerican). The district court held as a matter of law that MidAmerican was immune from federal antitrust liability under the state action immunity doctrine. See North Star Steel Co. v. MidAmerican Energy Holdings Co., No. 4-97-CV-80782 (S.D. Iowa June 23, 1998) (North Star). For reversal, North Star argues that the district court erred in finding that: (1) Iowa has a clearly articulated and affirmatively expressed policy displacing competition with regulation in the provision of retail electric service; (2) the regulatory policy is actively supervised by the state; and (3) there exists no genuine issue of material fact. For the reasons discussed below, we affirm the judgment of the district court.

## Jurisdiction

Jurisdiction was proper in the district court based upon 28 U.S.C. §§ 1331, 1337. Jurisdiction in this court is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed R. App. P. 4(a).

## Background

Although the parties basically agree on the relevant facts, they strongly dispute the nature and characteristics of the electric power industry. North Star, a wholly owned subsidiary of Cargill, Inc., operates a steel mill located near Wilton, Iowa. North Star uses a significant amount of electric energy to melt, refine, and shape scrap steel at its Wilton facility. The mill has a peak electric load of 48 megawatts.

MidAmerican is the largest electric utility in Iowa. In fact, MidAmerican owns the only transmission lines capable of supplying the North Star plant, which is located in the area designated under Iowa Code §§ 476.22-.26 (1997) as the exclusive electric service territory of MidAmerican. The company purchases, generates, transmits, and sells electric energy in significant portions of Iowa as well as in several neighboring states. MidAmerican generates approximately 75% of the electricity sold in its

exclusive service area, while it purchases the remaining 25% from third party generators. All of the electric energy, however, is sold by MidAmerican under its own "brand name."

In 1979, the Iowa General Assembly enacted legislation authorizing the Iowa Utilities Board (Board) to establish exclusive service territories in which specific electric utilities would provide the sole means of service to customers. See IOWA CODE § 476.25 (1997). The legislature found it "in the public interest to encourage the development of co-ordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public." Id. The Board implemented this legislation by promulgating regulations, beginning in June of 1979. See Establishment of Exclusive Service Areas for Electric Utilities by the Iowa State Commerce Comm'n, Docket No. RMU 78-11 (I.C.C. June 29, 1979) (Order Adopting Rules).[2] In doing so, the state effectively replaced the prior system under which utilities had competed for customers with one in which designated utilities have exclusive service territories.

Even under this regulatory framework, North Star sought to purchase competitively-priced electric energy. North Star, while recognizing MidAmerican as the exclusive distributor of electricity in its territory, wanted either to purchase directly power produced by a third party generator or to have MidAmerican itself purchase power from a third party expressly for transmission to North Star's mill. Under either "retail wheeling"[3] scenario, MidAmerican would remain the sole

---

[2]The Iowa State Commerce Commission is the administrative predecessor to the Iowa Utilities Board.

[3]"Retail wheeling" is defined as "allowing a customer to have access to MidAmerican's transmission and distribution facilities so that a customer can procure electricity from a third party to be delivered through MidAmerican's transmission and

distributor of electricity to North Star but would not be transmitting power that it had itself generated. MidAmerican rejected North Star's request. North Star brought the present action in federal district court claiming violations of the Sherman Act and Clayton Act by MidAmerican. North Star alleged that MidAmerican violated federal antitrust laws by refusing to allow it access over the transmission lines to alternate sources of electricity, thus preventing North Star from purchasing competitively-priced electricity for its steel mill. North Star alleged that MidAmerican's refusal to allow North Star access to alternate sources of electricity constituted a refusal to deal, monopolization, and an illegal tie-in.

MidAmerican filed a motion to dismiss which later became a motion for summary judgment.[4] However, before the district court ruled on the motion, MidAmerican requested a declaratory ruling from the Board. MidAmerican presented the Board with questions related to MidAmerican's rights and obligations pursuant to the Iowa Code provisions concerning the supply of retail electric service.[5] The

---

distribution facilities." In re MidAmerican Energy Co., Docket No. DRU-98-1, slip op. at 1(I.U.B. May 29, 1998), aff'd sub nom. North Star Steel Co. v. Iowa Utils. Bd., No. AA3127 (Iowa Dist. Ct. Polk County Jan. 29 1999), appeal docketed, No. 99-342 (Iowa Feb. 25, 1999).

[4]The district court treated the motion as one for summary judgment since the parties submitted affidavits.

[5]MidAmerican specifically presented the state with three questions. The first question is particularly relevant to this matter:

> Does the Board's assignment of an exclusive service area to MidAmerican, pursuant to Iowa Code §§476.22 through 476.26 and related sections, give MidAmerican the exclusive right and responsibility to sell electricity to retail customers within the assigned service area, or are MidAmerican's rights and obligations limited to the transmission and distribution of electricity that may be provided competitively by other sellers to retail customers.

Board held that "Iowa's exclusive service territory laws apply to the provision of electricity, and the provision of electricity includes generation, distribution, and transmission." In re MidAmerican Energy Co., Docket No. DRU-98-1, slip op. at 5 (I.U.B. May 29, 1998), aff'd sub nom. North Star Steel Co. v. Iowa Utils. Bd., No. AA3127 (Iowa Dist. Ct. Polk County Jan. 29 1999), appeal docketed, No. 99-342 (Iowa Feb. 25, 1999). The Board stated that MidAmerican has a statutory duty to provide electric service to customers in its exclusive service area. See id. at 7. The Board found that the statutes concerning the supply of retail electric service do not distinguish between the distribution, transmission, and generation of electricity. See id. at 6-7. Rather, the IUB interpreted the words "electric service" to include the actual supply of electricity. See id. The Board finally noted that there was no substantive difference between a customer directly buying the electricity generated by a third party or making MidAmerican buy the electricity and then distributing it to the customer. See id. at 8. Thus, the Board decided that both means of retail wheeling would violate MidAmerican's rights under the exclusive service territory state law and regulations.

Less than a month after the Board issued its declaratory ruling, the district court granted summary judgment in favor of MidAmerican. Referring to the Iowa Code provisions concerning retail electric service, the district court found that "Iowa has clearly articulated a state policy to prevent electricity suppliers from competing for retail customers." North Star, slip op. at 4. The district court further found that the Board has actively implemented the regulatory scheme enunciated by the Iowa General Assembly. See id. Having found that MidAmerican had satisfied both requirements for the state action immunity doctrine, the district court held that MidAmerican was accordingly immune from North Star's claim of antitrust violations. See id. at 4-5. The district court further held that there was no genuine

---

Id. Note that North Star proceeded to file comments in opposition to the Petition.

issue of material fact and that MidAmerican was entitled to judgment as a matter of law. See id. at 3.

The day after the district court granted summary judgment in favor of MidAmerican, North Star filed a petition for judicial review of the Board's declaratory ruling in the Iowa District Court for Polk County.[6]  The state court held that the Board had the authority to issue the declaratory ruling on the questions presented by MidAmerican.  See North Star Steel Co. v. Iowa Utils. Bd., slip op. at 8-9.  The court affirmed the Board's interpretation of the Iowa statutes, holding that the Iowa state exclusive service territory law and regulations include the generation of electricity. See id. at 8-9.

The Board subsequently approved a pilot program that allowed MidAmerican to sell electricity it purchased from third party generators directly to retail customers, with MidAmerican providing only transmission and distribution service.  See In re MidAmerican Energy Co., Docket No. TF-97-229 (I.U.B. Aug. 21, 1998).  The pilot program is unavailable to North Star, however, because the program's 10 megawatt limit per customer makes it uneconomical for large-load customers like North Star. In part based upon these recent developments, North Star appealed the district court's order granting summary judgment.

**Discussion**

We review the district court's grant of summary judgment *de novo*.  Summary judgment is proper if, assuming all reasonable inferences favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to

---

[6]Under Iowa law, the district court acts in an appellate capacity to correct errors of law by the administrative agency. See Freeland v. Employment Appeal Bd., 492 N.W.2d 193, 196 (Iowa 1992).

judgment as a matter of law.  See Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  Summary judgment is particularly appropriate when the unresolved issues are legal rather than factual.  See Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir. 1990).

North Star first argues that the district court erred in finding that the Iowa statutory provisions concerning assigned exclusive service areas include the generation of electricity.  Rather, North Star argues that these regulations apply only to the distribution of electricity, and not the generation of electricity.[7]  That is, North Star argues that the Iowa General Assembly may have displaced competition in the distribution of electricity, but not the market for the generation of electricity.

North Star further argues that Iowa's exclusive service regulatory scheme was not enacted with the purpose of displacing competition in the market for generating electricity.  North Star recognizes that one can infer a displacement of competition in the distribution market by the exclusive service areas because only one utility distributes electricity to each retail customer.  However, North Star contends that the same inference cannot be made with respect to the generation of electricity, because the utilities do not necessarily generate all of the electricity they distribute.  North Star points out that MidAmerican only generates 75% of the electricity it distributes in its exclusive service area.  The other 25% is produced by third party generators and then distributed by MidAmerican to the retail customers.  North Star also emphasizes the pilot program supporting retail wheeling as demonstrating that Iowa has not

_____

[7]North Star argues that there are three vertical markets in the industry, each of which has a different level of competition. These markets are: (1) the generation of electric energy; (2) the transmission of high voltage electric power from the generation plants to substations for conversion to delivery voltages; and (3) the distribution of low voltage electricity to retail customers. See Brief for Appellant at 14.

displaced competition in the market for generating electricity. Thus, North Star contends that Iowa does not have a clearly articulated or affirmatively expressed policy concerning the generation of electricity.

North Star also maintains that even if Iowa clearly articulated a policy displacing competition in the generation of electricity, the district court erred in finding that policy to be actively supervised by the state. North Star argues that Iowa does not monitor whether utilities wheel electricity produced by third party generators for the benefit of retail customers. In fact, North Star contends that MidAmerican is able to unilaterally decide whether to even request the Board's approval for such a program. North Star points out that although the Board may regulate the rates MidAmerican charges, the Board exercises no regulatory power with respect to whose generated power is ultimately distributed to retail customers. Therefore, North Star argues that the state action immunity does not apply because the Board fails to actively supervise MidAmerican's anti-competitive conduct.

Finally, North Star maintains that the district court erred in granting summary judgment because disputed issues of material fact, relating to the nature of the electric industry, have to be resolved before MidAmerican's state action immunity claim can be decided. North Star argues that three distinct markets, including (1) generation, (2) transmission, and (3) distribution, comprise the electric industry. North Star points out that there is conflicting expert evidence in the record concerning the nature of the electric industry. North Star's expert asserted the tripartite view of the electric industry, while MidAmerican's expert maintained that the industry is instead a single regulated monopoly at the retail level.

Before we analyze the applicability of the state action doctrine to the instant case, we must first determine what effect the decision by the state court has on these proceedings. The state court's decision affirming the Board's ruling raises the issue of collateral estoppel, also referred to as issue preclusion. Issue preclusion prevents

a party to a prior action in which a judgment has been entered from relitigating issues that were raised and resolved in that previous action. See, e.g., Hunter v. City of Des Moines, 300 N.W.2d 121, 123 (Iowa 1981). Federal courts must give state court judgments the same preclusive effect as would a court of the state in which the judgment was entered, which in this case is Iowa. See Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 81 (1984) (citing the Federal Full Faith and Credit Statute, 28 U.S.C. § 1738).

The Iowa Supreme Court has enunciated four conditions that must be met before applying issue preclusion: (1) the issue decided must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. See, e.g., Brown v. Kassouf, 558 N.W.2d 161, 163 (Iowa 1997) (Kassouf). Under Iowa law, issue preclusion may be applied to a trial court's ruling on the merits of an issue despite the pendency of an appeal from that ruling. See Peterson v. Eitzen, 173 N.W.2d 848, 850 (Iowa 1970) (holding that "[t]he judgment of the trial court is res adjudicata until set aside, modified or reversed"); see also Cochrane v. Cochrane, 124 F.3d 978, 982 (8th Cir. 1997), cert. denied, 118 S. Ct. 1044 (1998). Moreover, issue preclusion applies to the judgments in declaratory rulings. See Fournier v. Illinois Casualty Co., 391 N.W.2d 258, 260 (Iowa 1986). The Iowa Supreme Court has also ruled that mutuality of parties is not required when issue preclusion is used defensively.[8] See Kassouf, 558 N.W.2d at 164.

---

[8]The Iowa Supreme Court has found defensive issue preclusion to occur when "a stranger to the judgment [in the former action], ordinarily the defendant in the second action, relies upon [that] judgment as conclusively establishing in his favor an issue which he must prove as an element of his defense." Brown v. Kassouf, 558 N.W.2d 161, 164 (Iowa 1997).

We hold that, under Iowa law, the prior determination by the state court that the Board's assignment of exclusive service areas includes the generation of electricity collaterally estops this court from re-examining that same issue. The issue was identical in both actions and was properly litigated in the state court. Therefore, for purposes of this case, we will assume that under Iowa law the exclusive service territory provisions include the generation of electricity for retail sales.

We now consider the district court's determination that the state's exclusive service territory policy satisfied the requirements for state action immunity. Application of the state action immunity doctrine is a question of law. See, e.g., FTC v. Hospital Bd. of Directors, 38 F.3d 1184, 1187 (11th Cir. 1994). In Parker v. Brown, 317 U.S. 341, 350-51 (1943), the Supreme Court held that principles of federalism and state sovereignty precluded the application of federal antitrust laws to activity directed by state legislative action. The "state action doctrine" immunizes a private party from antitrust liability if (1) the private party acts pursuant to a "clearly articulated" and "affirmatively expressed" state policy to allow the anti-competitive conduct, and (2) the regulatory policy is "actively supervised" by the state itself. California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980) (Midcal). To satisfy the first prong of the Midcal test, the state as sovereign must clearly intend to displace competition in a particular field with a regulatory structure. See Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 64 (1985). In contrast, the second prong of the Midcal test serves essentially an evidentiary function to ensure that there is adequate state supervision of the regulatory policy. See FTC v. Ticor Title Insurance Co., 504 U.S. 621, 634-35 (1992). That is, the second prong ensures that the state exercises sufficient independent judgment and control over the regulated activity and prevents private parties from engaging in unsupervised anti-competitive behavior. See id.

We hold that the district court did not err in finding that Iowa "clearly articulated" and "affirmatively expressed" a policy displacing competition in the

-10-

market for retail electric service. The state statute expressly provides that its purpose is to create exclusive service areas which have only one supplier of electricity. See IOWA CODE § 476.25 (1997).[9] The policy to displace competition in the provision of retail electric service, including the generation of electricity, is unambiguous because the statute has been interpreted to include the generation of electricity. See In re MidAmerican Energy Co., Docket No. DRU-98-1, slip op. at 5. Thus, the exclusive service territory statute is explicit state authorization for displacing competition in both the distribution and generation of retail electric service.

Furthermore, the fact that MidAmerican does not generate all of its own electricity is irrelevant for our purposes because there is still no competition for retail customers under Iowa's regulatory scheme. See id. MidAmerican purchases the other electricity at wholesale, which is an entirely different market from retail.[10] Moreover, the retail wheeling pilot program supports the district court's finding that the state legislature has displaced competition in the electric industry. That program required specific Board approval, which indicates pervasive regulation, and only permits a limited amount of competition in the industry. The pilot program supports the

---

[9]The statute provides that:

> It is declared to be in the public interest to encourage the development of co-ordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public. In order to effect that public interest, the board may establish service areas within which specified electric utilities shall provide electric service to customers on an exclusive basis.

IOWA CODE § 476.25 (1997).

[10]In contrast with wholesale purchases, where the consumer buys electricity for the purpose of resale, retail purchases are meant for actual use by the buyer.

conclusion that there is a clearly articulated policy that does not generally allow competition for retail customers. We note that this interpretation is consistent with the Eleventh Circuit's decision in Municipal Utilities Bd. v. Alabama Power Co., 934 F.2d 1493, 1502 (11th Cir. 1991). In that case the court found that the Alabama legislature had clearly articulated a policy to displace competition in the retail electric market despite allowing some competition for industrial customers. See id.

The second prong of the Midcal test requires the state to actively supervise its regulatory policy that displaces competition. We hold that the district court did not err in finding that the Board actively supervises the exclusive service territories. Contrary to North Star's argument, the Board does more than regulate rates. See IOWA CODE § 476.8 (1997) (Board is statutorily mandated to ensure that the exclusive service providers supply "reasonably adequate service and facilities" at "reasonable and just" rates). Since establishing the exclusive service areas, the Board has continued to implement the state policy of displacing competition by assigning new customers to exclusive service providers and determining the assigned exclusive service provider in cases of doubt or conflict. Moreover, on numerous occasions the Board has issued administrative decisions applying the exclusive service area statutes to effectuate the policy that provides one retail electric supplier for each customer. See, e.g., Lamda Energy Marketing Co. v. IES Utilities., Inc., Docket No. FCU-96-8 (I.U.B. Aug. 25, 1997). The Board has repeatedly held that violation of the exclusive service territory statutes for the purpose of providing electric service is illegal. See, e.g., Harlan Municipal Utilities v. Nishnabotna Valley Rural Electric Coop., Docket No. SPU-93-16 (I.U.B. July 27, 1994).

Moreover, even less pervasive regulatory regimes have been held to satisfy the active supervision prong under the state action immunity doctrine. For example, Florida law permits utilities to enter into territorial agreements, if they choose, and requires that their agreements be submitted to the Florida Public Service Commission (FPSC) for approval. Unlike Iowa's statutes, however, Florida law does not empower

the FPSC to assign exclusive territories without a territorial agreement between the suppliers. Nevertheless, the Eleventh Circuit held that the FPSC's 1965 approval of an agreement between two utilities dividing service areas satisfied the second prong of the <u>Midcal</u> test pursuant to the state's policy of regulating electric service. <u>See</u> <u>Praxair, Inc. v. Florida Power & Light Co.</u>, 64 F.3d 609, 613-14 (11th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1190 (1996). In <u>TEC Cogeneration, Inc. v. Florida Power & Light Co.</u>, 76 F.3d 1560 (11th Cir. 1996), <u>modified</u>, 86 F.3d 1028, the Eleventh Circuit specifically upheld a utility's refusal to wheel power for cogenerators in its service territory, under the state action immunity doctrine. The court held that the state satisfied the active supervision requirement because it "played an active and substantial role in determining the specifics of the economic policy" pursued by the utilities. <u>Id.</u> at 1029.

Finally, North Star argues that the district court erred in granting summary judgment because there were disputed issues of material fact concerning the nature of the electric industry, including the deregulation that has recently taken place. As noted, the Board decided that the electric industry was unitary and the state court affirmed that decision. North Star is collaterally estopped from disputing the nature of the electric industry with respect to Iowa's exclusive service territory statute. Because Iowa has a clearly articulated and affirmatively expressed policy displacing competition in the provision of retail electric service, including generation, and the Board actively supervises that policy, there are no disputed issues of material fact that would preclude judgment as a matter of law in favor of MidAmerican under the state action immunity doctrine.

## Conclusion

For the reasons stated, we hold that the district court did not err in granting summary judgment in favor of MidAmerican. The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT