**ADVANCED COMMUNICATIONS CORPORATION, Plaintiff,**

v.

**MCI COMMUNICATIONS CORPORATION, Defendant.**

**No. 4:98CV00218GH.**

United States District Court,
E.D. Arkansas,
Western Division.

May 19, 2000.

Ted Boswell, Boswell, Tucker & Brewster, Bryant, AR, for plaintiff.

Kevin A. Crass, Friday, Eldredge & Clark, Little Rock, AR, Adam A. Charnes,

MCI Telecommunications Corp., Washington, DC, Mark D. Schneida, Jenner & Block, Washington, DC, Darrell F. Brown, Little Rock, AR, for defendant.

### MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

The matter currently before the Court is defendant's motion for judgment on the pleadings under Fed.R.Civ.P. 12(c). The central question presented is whether collateral estoppel precludes this Court from entertaining jurisdiction of plaintiff's complaint. After carefully considering the pleadings in this action as well as argument of counsel, the Court is persuaded defendant's motion for judgment on the pleadings should be granted for the reasons discussed hereinafter.

### I.

### BACKGROUND

On February 20, 1998, this case was filed in the Pulaski County Circuit Court alleging a claim for lost profits of at least $735 million plus punitive damages resulting from intentional tortious misconduct involved in the issuance and subsequent denial of a permit from the Federal Communications Commission (FCC) which had allowed plaintiff (ACC) to develop satellite orbital locations to provide Direct Broadcast Satellite (DBS) service. Specifically, the complaint alleged that the government granted ACC its first DBS construction permit back in 1984; that, by 1991. ACC had obtained from the government certain orbital satellite locations which would enable it to directly broadcast TV signals via satellite to homes across the entire continental United States; that the government had given ACC until December of 1994 to have its DBS system operational; that ACC has proceeded toward satellite launch from 1989 to 1994 including negotiations with telecommunication corporations including defendant (MCI); that in September of 1994, ACC entered into a contract with Tele–Communications, Inc. (TCI) in which TCI would provide satellites and ACC agreed to provide its satellite orbital locations; that as TCI would not be able to launch its satellites until after the December 1994 deadline, ACC requested an extension to commence DBS service; that such an extension request had never been denied before and has not been denied since; that prior to the FCC's final decision on whether to grant the extension, MCI offered a bribe to Chairman of the FCC Reed Hundt in an October 10, 1995 letter by agreeing to submit an opening bid of $175 million at a public auction of ACC's satellite orbital locations in consideration for his vote to deny the extension request; that on October 16, 1995. Hundt broke a 2–2 tie between the other commissioners by voting to deny the extension and took away ACC's orbital locations and frequencies it had accumulated since 1984; that the FCC conducted an auction on January 24 and 25, 1996, of ACC's orbital locations and frequencies; that MCI managed to obtain most of the locations by outbidding all comers for a total of $682.5 million; that the remaining locations were obtained by another company which outbid MCI for a total of 52.3 million; that ACC did not get anything of the $735 million paid for its satellite orbital locations; and that as a result of MCI's intentional tortious misconduct. ACC could not perform its contractual obligations to TCI which terminated the agreement.

The case was removed by MCI on March 25, 1998, on the basis of diversity jurisdiction. An order was filed on May 26, 1998, denying remand back to state court.

On June 9, 1998, MCI filed a motion for judgment on the pleadings on the grounds that ACC is estopped from bringing this action based on the doctrines of res judicata, collateral estoppel and pursuant to § 402(j) of the Telecommunications Act (Act), 47 U.S.C. § 402(j); that the First Amendment grants absolute immunity to MCI for its alleged actions; and that ACC has failed to state a claim for tortious

interference with contract. It states that the sole basis for the complaint is the alleged attempted "bribe" by MCI to Hundt to conduct an auction of DBS orbital slots assigned to ACC. It continues that this "bribe" was a publicly available letter from MCI's President and CEO to Hundt and the other Commissioners indicating that MCI would submit an opening bid for $175 million for one of ACC's forfeited slots should they come up for auction. The revenues would go to the United States Treasury, not the FCC or any individual Commissioner. MCI relates that MCI's request, along with several other interested parties, was that the FCC consider auctioning the DBS slots that had been assigned to ACC by the FCC for free in 1984 and that this request came at a time when ACC was woefully behind in its regulatory obligations to develop the DBS slot and there was substantial doubt ACC ever would.

MCI describes that the FCC's DBS regulations required ACC, among other things, to begin operating its system within six years of the construction permit grant; that ACC requested and was granted a four-year extension in 1990 by the FCC; that when the first extension was due to expire, ACC had made no progress toward constructing, much less, operating a DBS system and so sought a second extension and authority to assign its permit to a separate entity. Tempo DBS, Inc. a subsidiary of TCI; that ACC had to show that it had complied with its obligations under the FCC regulations to "proceed with diligence in constructing" the DBS system; that the FCC's International Bureau determined that ACC had failed its due diligence obligations by its own business decisions, denied the extension request and declared ACC's permit null and void; that this denial came months before MCI's proposed bid; and that the FCC ultimately affirmed the Bureau's decision. MCI further recounts that ACC challenged the FCC's decision in the D.C. Circuit Court of Appeals arguing that the FCC was improperly influenced by MCI's request and opening bid indication; that MCI intervened along with other parties in support of the FCC; that the appellate court rejected ACC's claims and upheld the FCC's decision; that ACC's petition for a writ of certiorari to the United States Supreme Court was denied; that the FCC subsequently decided to auction the forfeited DBS slots and that this auction decision was also upheld by the D.C. Circuit on review.

MCI argues that ACC has no valid cause of action since the allegations that form the crux of ACC's complaint were raised by ACC in a proceeding where MCI was a party and were conclusively resolved against ACC by the D.C. Circuit. It quotes that ACC's principal allegation in the D.C. Circuit was that "in deciding whether to grant ACC's extension request, the FCC improperly considered the revenues to be gained from the auction of ACC's orbital slots and channels." MCI next quotes the portion of the D.C. Circuit's opinion that addressed and rejected the issue of whether the denial of ACC's extension was based on the expectation of revenues from MCI's pledge to open bidding at $175 million if an auction were held. MCI asserts that the D.C. Circuit's resolution of these issues must be given preclusive effect against ACC since ACC is making the same allegations here based on the same factual premise.

MCI also argues that the D.C. Circuit had exclusive jurisdiction under § 402 of the Act to address any challenge to the FCC's order denying ACC's request for an extension of time on its construction permit, that the appellate court's judgment is final subject to review by the Supreme Court which was denied there, and that *de novo* litigation of all issues that were raised or could have been raised in that forum are precluded.

Moreover, MCI maintains that even if ACC were not estopped, the Petition Clause of the First Amendment protects MCI's request that the FCC offer certain forfeited DBS orbital locations at public auction pursuant to the *Noerr–Pennington*

doctrine. MCI points out that ACC has not alleged that its actions were within the "sham" exception and that MCI's successful effort to secure the benefits of governmental action would preclude such an argument. Finally, MCI declares that ACC has not stated a valid claim under Arkansas law for the tort of interference with contract or business expectancy.

ACC responded on June 22, 1998, and filed a motion for summary judgment.[1] It counters that discovery should be allowed to proceed before ruling on MCI's motion and that the factual allegations that Hundt was influenced by MCI's offer of $175 million in exchange for his vote have never been litigated, much less subject to the scrutiny of court-ordered discovery. It reviews the history of DBS and ACC with the FCC and the FCC's policy toward previous extension requests. The brief explains that in 1993 the Communications Act was amended to give the FCC authority to allocate spectrum by auction although consideration of profit was strictly forbidden. Next, ACC recounts statements made by Hundt about the magnitude of action-derived revenues that have been reaped by the Treasury including in the context of resisting congressional attempts to curtail his agency's budget. ACC contends that "[t]he fact presented in this case, which has never been litigated before, and which precludes this Court accepting MCI's arguments of collateral estoppel and res judicata, is whether MCI's promised opening bid of $175 million caused the Chairman to break the 2–2 tie between the other FCC commissioners, and deny Advanced's extension request." ACC excerpts an article that quotes an FCC official that they had not made up their minds before the MCI letter and that stopped the decision from being abstract to becoming a pragmatic decision. It argues that MCI has submitted no evidence that Hundt was not influenced by the bid offer, that the issue of whether Hundt's vote was influenced has not been resolved

by prior litigation because the D.C. Circuit refused to consider the FCC's alleged illicit motivation outside the text of the order being reviewed. ACC further argues that if the opening bid promise influenced the vote, which it contends the promise did, then MCI is responsible for conversion of ACC's locations, public servant bribery, or tortiously interfering with ACC's contact with TCI. ACC then goes through the state claim elements. It also states that there is no First Amendment immunity for illegal or fraudulent actions such as bribing governmental decision-makers. Finally, ACC declares that the FCC and MCI hid behind the presumption of regularity when the D.C. Circuit reviewed the FCC decision under the deferential standard while the evidence of the "truth about the actions" was not considered.

MCI filed a reply on July 6, 1998, in support of its motion for judgment on the pleadings. MCI insists that ACC continues to rehash the same facts and legal assertions it made before the D.C. Circuit and which that court rejected on the merits and so ACC cannot get a second bite at the apple by recasting its case as a tort. It reiterates that the issue as identified by ACC is the precise issue presented to the D.C. Circuit. Specifically, it references MCI's letter to the FCC Commissioners and Hundt's public statement regarding the funds that auctions of DBS slots and other public communications resources bring the government that ACC argued in its brief before the D.C. Circuit. MCI refutes ACC's argument that the appellate court refused to consider the factual allegations of influence by quoting from the opinion that the FCC order did not base its denial of the extension on the expectation of revenues. MCI again argues that its actions are absolutely protected by the First Amendment and ACC cannot make out a valid tort claim.

By memorandum opinion and order filed on September 28, 1998, Chief Judge

---

1. By order filed in March month, the Court denied this summary judgment motion without prejudice to renew after the motion for judgment on the pleadings is resolved.

Wright granted MCI's motion for judgment on the pleadings and denying ACC's motion for summary judgment as moot. ACC moved for reconsideration on October 8, 1998, which motion was denied by October 22, 1998 order. ACC appealed to the Eighth Circuit Court of Appeals on October 28, 1998.

Thereafter, Judge Wright discovered that she owned shares of MCI's stock and so had a conflict of interest when she had ruled on the motions. She notified the parties, held a telephone conference and advised the Eighth Circuit of these developments. On December 30, 1998, the appellate court remanded the case and the mandate was filed here on January 27, 1999. By order filed on January 29, 1999, Judge Wright vacated the September 28, 1998 opinion and judgment as well as the October 22, 1998 order and recused due to the conflict. The case was transferred to the undersigned on February 12, 1999.

The City of Little Rock moved on January 26, 2000, for leave to file a brief of amicus curiae stating that had the FCC extended the DBS license, the City would have enjoyed substantial economic development involving employment and the development of high technology so that defendant's conduct affected the financial and economic interest of the City and its citizens. MCI opposed that request by response filed on February 14th. The City filed a reply on March 14th attaching a copy of the proposed brief that the previous litigation dealt with constitutional issues whereas here the issue is whether MCI was involved in dirty tricks or engaged in deceitful practices which deprived ACC of its locations. By order filed on March 31st, the Court granted the City's motion and the amicus brief was filed that same date.

Due to the circumstances that led to the earlier judgment being vacated and the case being reassigned, the undersigned took the precaution of not reading Judge Wright's opinion until after the undersigned had reviewed the parties' briefs and tentatively reached a conclusion based on the Court's own research. However, the Court felt that oral argument on the motion for judgment on the pleadings would be helpful in clarifying several points. After the argument was scheduled, MCI and ACC submitted letters citing additional authority. At a hearing on April 25th, the Court heard arguments presented by MCI and ACC.[2] MCI focused on the relitigation and the *Noerr–Pennington* doctrine arguments while ACC touched on all issues raised in the motion.

## II.

## DISCUSSION

▆ A motion for judgment on the pleadings is not properly granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law. See, *National Car Rental Sys., Inc. v. Computer Assocs. Int'l. Inc.*, 991 F.2d 426, 428 (8th Cir.1993). In determining whether any material issues of fact remain, the court must accept all facts pled by the non-moving party as true and all reasonable inferences must be construed in favor of the non-moving party. See, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990).

*In re Anderberg–Lund Printing Co.*, 109 F.3d 1343, 1346 (8th Cir.1997) explained estoppel concepts as follows:

> The binding effect of a former adjudication, often generically termed res judicata, can take one of two forms. Claim preclusion (traditionally termed res judicata or "merger and bar") " 'bars relitigation of the same claim between parties or their privies where a final judgment has been rendered upon the

---

**2.** Although counsel for the City attended, the Court notes that the City's brief states that it "is not an attempt to persuade this Court to reverse the doctrines of *res judicata* or estop- pel if the same is appropriate. The Plaintiff and Defendant must litigate this issue, not the City."

merits by a court of competent jurisdiction.'" *Plough v. West Des Moines Community Sch. Dist.,* 70 F.3d 512, 517 (8th Cir.1995) (quoting *Smith v. Updegraff,* 744 F.2d 1354, 1362 (8th Cir. 1984)). Issue preclusion (or "collateral estoppel") applies to legal or factual issues "actually and necessarily determined," with such a determination becoming "conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

See also, *Larken, Inc. v. Wray,* 189 F.3d 729, 732 (8th Cir.1999); *North Star Steel Co. v. MidAmerican Energy Holdings Company,* 184 F.3d 732, 736 (8th Cir.1999).

The case of *Advanced Communications Corp. v. FCC,* 84 F.3d 1452, 1996 WL 250460 **2–4 (D.C.Cir.1996), *cert. denied,* 519 U.S. 1071, 117 S.Ct. 718, 136 L.Ed.2d 636 (1997), held in pertinent part:

> With this standard in mind, we turn to appellants' contention that the Commission's revocation of its construction permit was an arbitrary departure from settled Commission precedents and policies. Appellants point to ACC's promotional activities in advancing the development of DBS and contend that ACC's efforts to satisfy its permit requirements were no less diligent than those of other DBS permittees whose extension requests had been granted, and that the FCC failed to explain how ACC's performance differed in any relevant respect from that of the permittees in those other cases.
>
> \*      \*      \*      \*      \*      \*
>
> We reject appellants' contention that the decision in the Order is irreconcilable with other decisions in which the Commission has either granted an extension or allowed a transfer of control. To the contrary, the Commission has articulated sufficiently principled distinctions from these other cases to withstand review.
>
> \*      \*      \*      \*      \*      \*

Finally, we address appellants' contention that the FCC violated 47 U.S.C. § 309(j)(7)(A) by allowing the "expectation of Federal revenues [to play] a large role in [the] decision to deny [ACC's] application." Brief for Appellants at 24 (internal quotations omitted). While the Commission was aware that substantial sums could be realized from the sale of any orbital slots and channels recovered from ACC, see *Advanced II* at ¶ 67 n. 127 (acknowledging the pledge by MCI to open bidding at $175 million in the event an auction were held), the Order does not base its denial of ACC's renewal application on the expectation of such revenues. Rather, the Commission's decision was predicated on ACC's failure to achieve "any concrete progress toward the actual construction and operation of its DBS system" during its first extension period. *Id.* at ¶ 37. Appellants are thus asking us to search beyond the text of the Order to find some alleged illicit motivation on the part of the FCC. This we are unwilling to do. "Agency opinions, like judicial opinions, speak for themselves." *Checkosky v. SEC,* 23 F.3d 452, 489 (D.C.Cir.1994); and appellants have pointed to nothing in the record that is sufficient to overcome the "strong presumption of agency regularity." *Louisiana Ass'n of Indep. Producers v. FERC,* 958 F.2d 1101, 1111 (D.C.Cir.1992). Of course, we express no opinion as to whether the Commission was in fact barred by law from taking into account the expected impact on federal revenues.

■ Although ACC argues that the D.C. Circuit did not have all the facts and did not address the merits of whether the expected revenues referenced in the MCI letter motivated the FCC's decision against an extension, the excerpts from the D.C. Circuit opinion quoted above clearly show that the claims about "whether MCI's promised opening bid of $175 million caused the Chairman to break the 2–2 tie between the other FCC commissioners, and deny Advanced's extension request"

were raised before the D.C. Circuit and decided adversely to ACC. Thus, ACC is attempting to relitigate factual and legal issues that have already been decided once before. It matters not whether ACC does have additional facts not known then or that different legal theories are now being advanced.[3] ACC's lawsuit is simply that second bite at the apple that is prohibited by the doctrine of issue preclusion or collateral estoppel. Therefore, the Court need not address the remaining issues raised in the motion for judgment on the pleadings.

Accordingly, MCI's motion (# 17) for judgment on the pleadings is granted thereby mooting its April 10th motion (# 56) for reconsideration of protective order and to stay discovery. MCI's May 10th notice/motion (# 60) to change corporate name is granted. The Clerk is directed to change the defendant's name in accordance with the notice

### JUDGMENT

In accordance with the separate order filed this date, judgment on the pleadings is hereby entered in favor of defendant and against plaintiff.

---

**3.** ACC's April 25th argument relying on *Richardson v. Phillips Petroleum Co.,* 791 F.2d 641 (8th Cir.1986), that since damages could not be sought in the review by the D.C. Circuit of an administrative agency's decision, this tort action is not an attempt to relitigate must be rejected. The factual determination that the extension was properly denied because of ACC's lack of due diligence would have to be rejected by the jury here for ACC to prevail with its claim that the extension was improperly denied because of the auction bid offer. Thus, ACC is attempting by the back door what it could not obtain by the front door.