Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 16, 2004          Decided July 30, 2004

No. 03-1082

ADVANCED COMMUNICATIONS CORPORATION,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

ECHOSTAR SATELLITE CORPORATION,
INTERVENOR

————

Appeal of an Order of the
Federal Communications Commission

————

*Robert Corn–Revere* argued the cause for appellant. With him on the briefs was *Pamela C. Cooper*.

*Stewart A. Block*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *John A. Rogovin*, General Counsel, and *Daniel M. Armstrong*, Associate General Counsel.

*Pantelis Michalopoulos* argued the cause and filed the brief for intervenor. *Alice E. Loughran* entered an appearance.

Before: Rogers and Garland, *Circuit Judges,* and Williams, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* Garland.

Garland, *Circuit Judge*: Advanced Communications Corporation (ACC) appeals from an order of the Federal Communications Commission (FCC) denying the company's petition to reopen the record in a proceeding closed nearly a decade ago. Because we conclude that the Commission did not abuse its discretion in declining to reopen, we affirm the decision below.

I

The history of the Commission's earlier ACC proceeding is set forth in detail in our previous opinion involving this dispute, and we therefore provide only the necessary background here. *See Advanced Communications Corp. v. FCC*, 84 F.3d 1452, 1996 WL 250460 (D.C. Cir. May 3, 1996) (unpublished table decision) (*Advanced I*).

In 1984, the FCC awarded ACC a conditional construction permit to provide direct broadcast satellite (DBS) service. In the interest of "ensur[ing] the prompt use of DBS spectrum resources," *id.* at *1, FCC rules required ACC to satisfy two due diligence requirements applicable to all DBS permittees. First, ACC had to " 'begin construction or complete contracting for construction' " within one year of receiving the permit. *Id.* (quoting 47 C.F.R. § 1001.19(b)). Second, ACC had to commence operating its system within six years of receiving the construction permit. *Id.* The company fulfilled the first requirement, and in 1986 it was assigned channels at two orbital locations. Despite a four-year extension, however,

ACC failed to meet the second requirement. In April 1995, the FCC's International Bureau denied ACC's request for a second four-year extension to construct, launch, and operate a DBS system, and it cancelled ACC's construction permit.

On October 16, 1995, the Commission affirmed the denial of the extension and the cancellation of ACC's permit. *Advanced Communications Corp.*, 11 FCC Rcd 3399, 3400 (1995) (hereinafter 1995 Order). Commissioners Quello and Barrett dissented. *Id.* at 3430, 3435. In a notice of proposed rulemaking published shortly thereafter, the Commission proposed to reassign the reclaimed channels and orbital locations (hereinafter collectively referred to as "spectrum") by auction. *In the Matter of Revision of Rules and Policies for the Direct Broadcast Satellite Service*, 11 FCC Rcd 1297, 1298 (1995). Commissioner Barrett again dissented. *Id.* at 1349. The proposal was ultimately adopted, and MCI Communications and EchoStar Communications won the subsequent auction for a total price of more than $700 million. MCI later assigned its spectrum to EchoStar, which currently provides DBS service to millions of customers nationwide.

ACC appealed the 1995 Order to this court, making three arguments: (1) the FCC's decision constituted an arbitrary departure from the agency's precedents; (2) the FCC failed to provide a reasoned explanation for its decision; and (3) in deciding to deny ACC's requested extension, the FCC improperly considered the revenues that would be gained from the auction of ACC's spectrum. *Advanced I*, 1996 WL 250460, at *2. The last argument, of particular importance here, was based on a claim that consideration of revenues by the FCC would violate section 309(j)(7)(A) of the Communications Act, which provides:

> In making a decision pursuant to section 303(c) of this title to assign a band of frequencies to a use for which licenses or permits will be issued pursuant to this subsection, ... the Commission may not base a finding of public interest, convenience, and necessity on the expec-

tation of Federal revenues from the use of a system of competitive bidding under this subsection.

47 U.S.C. § 309(j)(7)(A).

On May 3, 1996, this court rejected ACC's appeal. We concluded that the FCC's decision was consistent with its precedents, and that it included a reasoned explanation for the disposition. *Advanced I*, 1996 WL 250460, at \*3–4. We also found that, "[w]hile the Commission was aware that substantial sums could be realized from the sale of any orbital slots and channels recovered from ACC, the Order d[id] not base its denial of ACC's renewal application on the expectation of such revenues." *Id.* at \*4 (internal citation omitted). "Rather," we said, "the Commission's decision was predicated on ACC's failure to achieve any concrete progress toward the actual construction of its DBS system during its first extension period." *Id.* (internal quotation marks omitted). And we concluded that ACC had "pointed to nothing in the record that is sufficient to overcome the strong presumption of agency regularity." *Id.* In light of that conclusion, we found it unnecessary to decide "whether the Commission was in fact barred by law from taking into account the expected impact on federal revenues." *Id.*

ACC continued to pursue its case in other fora. In 1998, ACC sued MCI in Arkansas federal court, alleging tortious interference with contract and again claiming that the FCC had denied ACC's request for an extension because of the revenues that an auction would bring. The district court held that *Advanced I* collaterally estopped ACC from relitigating the revenues issue, *Advanced Communications Corp. v. MCI Communications Corp.*, 101 F. Supp. 2d 1154, 1159–60 (E.D. Ark. 2000), and the Eighth Circuit affirmed, 263 F.3d 793, 795 (8th Cir. 2001). In October 2001, ACC petitioned this court for a writ of mandamus directing the FCC to invalidate the 1995 Order in light of two affidavits that it had recently obtained from (by then) former Commissioners Barrett and Quello. We denied the petition, declaring that it provided no justification for the extraordinary remedy of mandamus. *In*

*re: Advanced Communications Corp.*, 2001 WL 1699340, at *1 (D.C. Cir. Dec. 19, 2001).

In April 2003, Advanced petitioned the Commission to reopen the record for further proceedings based on what it contended was new evidence that the 1995 Order had been the product of improper considerations. The new evidence consisted of the aforementioned affidavits by the two Commissioners who had dissented from the 1995 Order. The identically worded affidavits, signed in October 2001, declared the affiants' view that "at least one of the Commissioners in the majority based his or her decision in the Advanced Order on the expectation of Federal revenues that would result from the reassignment by auction of the channels and orbital locations previously assigned to ACC." Affidavit of James H. Quello (J.A. 529); Affidavit of Andrew C. Barrett (J.A. 536). The FCC denied ACC's petition to reopen the record, concluding that the "new evidence that Advanced submits is nothing more than another attempt to re-argue the issue that it has presented in numerous prior court proceedings." *Advanced Communications Corp.*, 18 FCC Rcd 2926, 2929 (2003) (hereinafter 2003 Order). The affidavits, the FCC said, failed to meet the "strong showing of sufficiency of evidence" required to overcome the public interest in orderly and final agency action. *Id.* at 2930.

## II

Before proceeding to the merits, we must say a few words about the standards of review applied by this court and the FCC.

1. "[A] petition seeking review of an agency's decision not to reopen a proceeding is not reviewable unless the petition is based upon new evidence or changed circumstances." *Southwestern Bell Tel. Co. v. FCC*, 180 F.3d 307, 311 (D.C. Cir. 1999). Where, as in this case, the petition is based on a claim of new evidence, we do have jurisdiction to review, but we may reverse only upon "a showing of the clearest abuse of discretion." *Interstate Commerce Comm'n v. Brotherhood of*

*Locomotive Eng'rs*, 482 U.S. 270, 278 (1987) (internal quotation marks omitted).

Additional considerations further confirm the need for a deferential standard of review. Where, as here, the petition for reopening comes not before judicial review but after, and not immediately after but long after, we are loathe to overturn settled expectations. *See Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 288–89 (D.C. Cir. 1971) (noting that "investments may be made in reliance on such an order," and that at some point "the public interest in finality is dominant over the public interest in possibly improving the administrative result on further consideration"). Moreover, where, as here, the petition seeks an inquiry into the motives of decisionmakers whose decision is reflected in official findings, "there must be a strong showing of bad faith or improper behavior" before a court will permit such an inquiry. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see Checkosky v. SEC*, 23 F.3d 452, 489 (D.C. Cir. 1994) (declaring that "[a]gency opinions, like judicial opinions, speak for themselves"); *see also PLMRS Narrowband Corp. v. FCC*, 182 F.3d 995, 1002 (D.C. Cir. 1999); *San Luis Obispo Mothers for Peace v. NRC*, 789 F.2d 26, 44–45 (D.C. Cir. 1986).[1]

---

[1] The FCC urges us to regard ACC's appeal not as a request to reopen agency proceedings, but as one to recall the mandate we issued in *Advanced I*. According to the Commission, it does not have authority to reopen that closed proceeding unless we first recall the mandate that affirmed the 1995 Order. Moreover, the Commission continues, we may not issue such a recall except in "exceptional circumstances," upon a "showing of 'good cause' and the need to 'prevent injustice.'" *Greater Boston*, 463 F.2d at 277–78. To resolve this case, however, there is no need to decide whether ACC's appeal must be styled as a request to recall our mandate, rather than as one to review a refusal to reopen. *Compare Greater Boston*, 463 F.2d at 291 (denying an FCC request to recall the court's mandate to permit the agency to hear argument regarding whether to reopen a comparative licensing proceeding), *with Standard Oil Co. v. United States*, 429 U.S. 17, 18 (1976) (holding that, although "Courts of Appeals have required appellate

2. The FCC's own standard for reopening a closed pro-
ceeding reflects many of these same considerations. As the
FCC explained, "[u]nder ordinary circumstances," an appli-
cant seeking to reopen a proceeding after the close of the
record must show:

> (1) that it relies on new or newly discovered evidence
> that could not, through the exercise of due diligence,
> have been discovered earlier; (2) that the new evidence,
> if proven, would raise a substantial and material question
> of fact affecting the ultimate outcome of the proceeding;
> and (3) that there is a substantial likelihood of proving its
> potentially disqualifying allegations if the case is remand-
> ed for further review.

2003 Order, 18 FCC Rcd at 2930 n.20 (citing, inter alia, *Eve
Ackerman*, 8 FCC Rcd 4205, 4205 (1993)); *see also* 47 U.S.C.
§ 405(a); 47 C.F.R. § 1.106(b)(2)(i)-(ii), (c). This test re-
quires "a particularly strong showing of substantive sufficien-
cy for post-hearing motions to reopen the record," and re-
flects the Commission's effort to balance the "interest in
preserving finality and expediting service to the public
against the benefits of future litigation." *Eve Ackerman*, 8
FCC Rcd at 4205, ¶ 6. The FCC has generally employed this
test when the petition to reopen comes *before* judicial review
has taken place. *See, e.g., id.*; *Omaha TV 15, Inc.*, 4 FCC
Rcd 730 (1988); *Apogee, Inc. et al.*, 59 Rad. Reg. 2d (P&F)
941 (1986). In this post-review case, the FCC further raised
the threshold for reopening: "[G]iven the time that has
passed since the termination of the Advanced proceeding, and
the use that has been made of the satellite orbital locations
and frequencies, the burden is extraordinarily high." 2003
Order, 18 FCC Rcd at 2930–31. Since our own standard of
review reflects these same considerations, we can hardly

---

leave before the District Court could reopen a case which had been
reviewed on appeal," the "arguments in favor of requiring appellate
leave are unpersuasive"). As just discussed, our standard of review
for denials of reopenings is itself highly deferential, and if there is a
material difference between that standard and the one applicable to
recalls, it is of no consequence here.

regard the FCC's decision to take them into account as unreasonable.

3. In sum, the task confronting ACC is a difficult one. It must show that the proffered evidence clears the high hurdle required by the FCC to reopen a closed record, and that it does so by such a margin that it meets this court's own high threshold for reversing the agency's refusal to reopen. But we have already paid far more attention to the height of the bar than is necessary. As we shall see, ACC's asserted "new evidence" falls short of justifying reopening even under the standard the FCC applies in "ordinary circumstances."

## III

ACC presented to the Commission what it regarded as new evidence showing that, in denying ACC's request for a permit extension, at least one Commissioner based his decision on the impact it would have on federal revenues. In determining whether to reopen the 1995 proceeding in light of that evidence, the Commission assumed — without deciding — the validity of ACC's premise: that a decision based on revenue considerations would have violated 47 U.S.C. § 309(j)(7)(A). We proceed in the same manner.

The "new" evidence proffered by ACC consisted of the sworn affidavits of former Commissioners Quello and Barrett. The affidavits were identical, and stated, in pertinent part:

> [B]ased on my deliberations with the other Commissioners, at least one of the Commissioners in the majority based his or her decision in the Advanced Order on the expectation of Federal revenues that would result from the reassignment by auction of the channels and orbital locations previously assigned to ACC, which I believe violates 47 U.S.C. § 309(j)(7)(A).

Affidavit of James H. Quello (J.A. 529); Affidavit of Andrew C. Barrett (J.A. 536). The Commission reasonably concluded that the affidavits were insufficient to justify reopening the 1995 proceeding.

First, whether or not this evidence was available in 1995, ACC offers no reason why it "could not, through the exercise of due diligence, have been discovered earlier" than October 2001. *Eve Ackerman*, 8 FCC Rcd at 4205, ¶ 6; *see W.S. Butterfield Theatres, Inc. v. FCC*, 237 F.2d 552, 555 (D.C. Cir. 1956) ("Delay in seeking reopening of the record is a factor to be weighed in the exercise of the Commission's discretion."). Even if ACC could not have been expected to obtain the affidavits while Barrett and Quello were still Commissioners, both were gone from the Commission by November 1997, *see* Intervenor's Br. at 18, and ACC has not explained why the affidavits could not have been procured soon thereafter. During the following four years, third parties like MCI and EchoStar relied on the finality of the 1995 Order in ordering their investments and operations. That good faith reliance on a final administrative determination rightly weighed heavily in the agency's decision not to reopen the proceeding. *See Greater Boston*, 463 F.2d at 289, 291.

Second, the affidavits themselves are insufficient to raise a "substantial and material question of fact affecting the ultimate outcome" of the 1995 proceeding. *Eve Ackerman*, 8 FCC Rcd at 4205, ¶ 6. The affidavits are wholly conclusory, lacking specificity regarding the identity of the allegedly miscreant Commissioner, or the date or contents of his or her offending statements. The affiants do not state what it was about their "deliberations with the other Commissioners" that formed the basis for their conclusion that at least one rested his or her decision on the expectation of federal revenues. Nor does ACC offer any explanation for why the affidavits fail to provide such specificity. The company does not, for example, contend that compulsory process is needed to extract more information from the affiants. To the contrary, ACC concedes that its counsel had access to the former Commissioners; indeed, ACC confesses that its own counsel drafted the affidavits. Oral Arg. Tape at 1:58 (D.C. Cir. Jan. 16, 2004). On their face, then, the affidavits may reflect nothing more than the common refrain of many dissenting opinions: the majority's position seems so "wrong" that it

"must" have been the product of inappropriate policy considerations.

Third, to the extent that the affiants have something more specific in mind, ACC has not shown that it is truly new or likely to alter the outcome of the 1995 proceeding. In *Advanced I*, ACC made the same argument that it does here: that the FCC based its denial of ACC's request for a second extension on the Commission's consideration of the revenues to be gained from the auction of ACC's spectrum. *See Advanced I*, 1996 WL 250460, at *2. In support of that contention, ACC offered three pieces of evidence. First, ACC pointed to public statements that then-Chairman Reed Hundt made in 1995 — in congressional testimony and in a speech at the National Consumers Week Symposium — emphasizing the revenue generated by spectrum auctions. *See* Brief for Appellants at 17, *Advanced I* (J.A. 158) (quoting Hundt's June 1995 testimony "referring to Commission as 'the largest single government profit center' because of auction revenues"); *id.* (quoting Hundt's October 1995 speech declaring "that 'FCC stands for Federal Cash Cow' and that the agency is 'the goose that lays the golden eggs'"). Second, ACC noted an October 10, 1995 letter from MCI to the Commission — cited in the 1995 Order — that offered "an opening bid of $175 million" if an auction were held for ACC's reclaimed spectrum. *Id.* at 19 (J.A. 160) (quoting 1995 Order, 11 FCC Rcd at 3424 n.127). Finally, ACC pointed to Commissioner Barrett's dissent from the 1995 rulemaking notice that proposed holding an auction for the reclaimed spectrum. In his dissent, Barrett revealed that, "prior to rendering a decision in the *Advanced Order*, one of my colleagues asked me whether this alleged opening bid [by MCI] would persuade me that auctioning the 27 channels was appropriate." *Id.* at 21 (quoting Statement of Commissioner Andrew C. Barrett, *In the Matter of Revision of Rules and Policies*, 11 FCC Rcd at 1351 n.5).

Notwithstanding this evidence, the *Advanced I* court concluded that "nothing in the record . . . [was] sufficient to overcome the 'strong presumption of agency regularity.'" 1996 WL 250460, at *4 (quoting *Louisiana Ass'n of Indep. Producers v. FERC*, 958 F.2d 1101, 1111 (D.C. Cir. 1992)). As we have discussed, the new affidavits themselves add

nothing that would change this conclusion. Hence, the remaining question — which we put to ACC at oral argument — is this: what is the most that the former Commissioners can be expected to say at a reopened proceeding in support of the conclusion recited in their affidavits? Conceding that he would be speculating, ACC counsel stated that the affiants might testify that Chairman Hundt had said, in the privacy of the Commission's deliberations, precisely what he had been saying in public: that auctioning off reclaimed spectrum would generate substantial revenue. Oral Arg. Tape at 3:30 (D.C. Cir. Jan. 16, 2004).

But even if a reopened proceeding produced such evidence, it would not be enough to change the original outcome. This court has already held in *Advanced I* that Hundt's public statements were insufficient to undermine the validity of the 1995 Order. We do not see why knowing that Hundt said in private what he had been proclaiming in public should make a difference. Indeed, Commissioner Barrett's 1995 dissent intimated that something just like that had transpired, yet it proved inadequate to sway the court in *Advanced I*. And as we said in *PLMRS Narrowband Corp. v. FCC*, even direct evidence that a Commissioner "flirted with an impermissible rationale" during an agency's decisionmaking process is generally insufficient to require reversal of the agency's final decision. 182 F.3d at 1001–02. The current Commission — no member of which was serving in 1995 — has concluded that ACC's new evidence fails to meet the "strong showing of sufficiency of evidence" required to overcome the interest in administrative finality. 2003 Order, 18 FCC Rcd at 2930. We detect nothing unreasonable in that conclusion.

## IV

For the foregoing reasons, the FCC's order denying Advanced's petition is

*Affirmed.*