**PLMRS NARROWBAND CORP., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

Nos. 92–1432, 92–1440, 97–1329, 97–1330, 97–1339 and 97–1340.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 19, 1999.

Decided July 16, 1999.

A. Thomas Carroccio argued the causes for petitioners/appellants and filed the briefs for petitioner/appellant Columbia Capital Corporation.

Richard S. Becker, James S. Finerfrock and Jeffrey E. Rummel were on the briefs for petitioner/appellant PLMRS Narrowband Corp.

K. Michele Walters, Counsel, Federal Communications Commission, argued the cause for appellees. With her on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Marion Jetton, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, John E. Ingle, Deputy Associate General Counsel, and Laurel R. Bergold, Counsel.

Before: GINSBURG, RANDOLPH, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In 1991 the Federal Communications Commission proposed to grant by lottery four licenses, each comprising several land mobile radio channels in the 220–222 MHz range, designated for nationwide, noncommercial use; that is, the chosen licensee could use the channels for its own internal communications needs but generally could not lease the channels to others. *See Amendment of Part 90 of the Commission's Rules to Provide for the Use of the 220–222 MHz Band by the Private Land Mobile Radio Services,* 6 F.C.C.R. 2356 (1991) (*Original Order*); 7 F.C.C.R. 4484 (1992) (*Reconsideration Order*); 8 F.C.C.R. 4161 (1993) (*Second Reconsideration Order*). Ultimately, however, the Commission decided to assign the licenses by auction rather than by lottery and to permit licensees to use the channels for commercial as well as non-commercial purposes. *See Third Report and Order; Fifth Notice of Proposed Rulemaking,* 12 F.C.C.R. 10,943, ¶ 6 (1997).

PLMRS Narrowband Corporation and Columbia Capital Corporation, each of which filed applications under the *Original Order,* petition for review of the *Reconsid-eration Orders* and of the *Third Report and Order.* They ask the court to vacate those orders and to require the Commission to process their applications under the *Original Order.* We reject on its merits the petitioners' challenge to the *Third Report and Order,* and hence dismiss as moot their challenge to the superseded *Reconsideration Orders.*

## I. Background

Land mobile radio is used to send messages via radio signals between a stationary transmission point and mobile receiving units, in order to provide such services as cellular telephony, paging, and the dispatch of taxicabs, delivery vehicles, and police cars. *See Telocator Network of Am. v. FCC,* 691 F.2d 525, 527 (1982). The four nationwide noncommercial licenses the Commission proposed to grant in 1991 were to be used primarily for the licensees' own internal communications needs and, only insofar as a licensee had excess capacity, to be leased to others. *See Original Order,* 6 F.C.C.R. 2356, ¶ 37 (predicting "non-commercial nationwide licensees will require full usage of their systems for their own communications needs in the major metropolitan areas, but may have excess capacity in [smaller] urban areas and in rural areas"). In order to "minimize the filing of speculative applications," *id.* ¶ 48, the Commission limited the transferability of licenses, provided for automatic license revocation if two-and four-year construction benchmarks were not met, and required licensees to install base stations in at least 70 markets within ten years. *Id.* ¶¶ 49, 68, 83. The Commission received 34 applications, including those of the two present petitioners, for the four non-commercial licenses.

The following year the Commission, upon reconsideration, further restricted the transferability of licenses and the commercial leasing of excess capacity, shortened the construction deadlines, and required that an applicant demonstrate either its actual presence, or a long-term

business plan requiring internal communications capacity, in the 70 or more markets identified in its application. *See Reconsideration Order,* 7 F.C.C.R. 4484, ¶¶ 24–29. In 1993, upon further reconsideration, the Commission repealed the regulation permitting an applicant to submit a long-term business plan and simply required that it have an actual presence in 70 or more markets. *See Second Reconsideration Order,* 8 F.C.C.R. 4161, ¶ 10.

Later that year the Congress authorized the Commission to auction licenses for uses in which the licensee "receiv[es] compensation from subscribers." Omnibus Budget Reconciliation Act of 1993, Pub L. No. 103–66, § 6002(a), 107 Stat. 312, 388 (formerly codified at 47 U.S.C. § 309(j)(2)(A)). In 1997 the Commission designated for such commercial use and determined to assign by auction the four licenses it had originally designated for non-commercial use and assignment by lottery. The agency returned pending applications filed under the rules promulgated for non-commercial use of the four licenses. *See Third Report and Order,* 12 F.C.C.R. 10,943, ¶¶ 183–203.

## II. Analysis

■ The petitioners challenge the *Third Report and Order* and the *Reconsideration Orders* as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Under this deferential standard of review we must affirm the Commission's decision if it examined the relevant information and gave a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

## A. PLMRS's Challenge to the *Third Report & Order*

■ Although it "expressly supports" the Commission's designation of the licenses for commercial use in the *Third Report and Order,* PLMRS claims the Commis-

sion acted arbitrarily and capriciously both in deciding to auction those licenses and in returning the application it filed under the previously promulgated rules. Its support for the Commission's designation of the licenses for commercial use in 1997 places in a rather odd light its ultimate contention that the agency must limit the applicant pool to entities that applied for the licenses in 1991, when they were designated for non-commercial use.

In permitting additional applicants to compete for the newly-designated commercial licenses, the Commission explained:

> [B]ecause the nature of the 220 MHz service is undergoing such substantial change, it would be unfair to preclude new applicants from having the opportunity to apply for these 220 MHz licenses. In 1991, when the pending applications were filed, parties interested in using the 220 MHz spectrum may have decided not to apply for these licenses because the rules precluded a licensee from offering the type of service that these parties desired to offer, such as primary fixed service, paging, or nationwide commercial service.

*Third Report and Order,* 12 F.C.C.R. 10,943, ¶ 200. PLMRS claims there would be no such unfairness because the Commission had in the *Original Order* designated four other licenses for nationwide commercial use. Anyone seeking a commercial license in 1991, PLMRS reasons, had an opportunity to apply for it, and "nothing in the record supports the FCC's finding that such entities opted out of the 1991 filing process because the rules precluded the type of service that these parties desired to offer."

This is a non sequitur. That one had an opportunity to apply for other commercial licenses does not justify denying one an opportunity to file for the formerly non-commercial licenses once that restriction is lifted. In any case, PLMRS itself represents that in 1991 there were 140 applicants for the four commercial licenses.

The Commission reasonably concluded that some of those applicants may have decided not to apply for the four licenses now at issue because they were not then designated for commercial use. *See id.* (PLMRS acknowledges that a commercial license is more valuable than a non-commercial license.) When "an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, our role is ... limited [to requiring] only that the agency so state and go on to identify the considerations it found persuasive." *Melcher v. FCC*, 134 F.3d 1143, 1152 (D.C.Cir. 1998). The Commission easily meets that standard here.

The Commission also gave an affirmative reason grounded in public policy for expanding the existing pool of applicants: "Opening a filing window for all interested applicants ... will increase the likelihood that competitive processes will trigger the delivery of a broad array of services to customers at reasonable prices." *Third Report and Order*, 12 F.C.C.R. 10,943, ¶ 200. PLMRS does not even attempt to cast doubt upon this justification for the Commission's change of course.

■ Instead PLMRS next argues that the Commission, by returning all pending applications and electing to auction the licenses, invited unreasonable delay because it was inevitable that the original applicants would challenge those actions in court. As the Commission noted in the final rule, however, had it not returned the applications of PLMRS and others it would just as certainly have faced a court challenge from parties interested in obtaining commercial licenses. *See id.* ¶ 203. We give such a predictive judgment our deference, of course. *See Melcher*, 134 F.3d at 1152; *FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775, 814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ("[A] forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency"). Deference aside, we do not endorse PLMRS's suggestion that an agency must gauge the public interest with reference to the litigation incentives facing private parties. To charge an agency with the delay imposed upon it by others—in effect to encourage the agency to adopt the course found least objectionable to interested parties—would hardly seem to further the public interest, and would create a perverse incentive for parties to threaten the agency with litigation.

■ PLMRS also contends that because the Commission in 1993 granted the four licenses it had designated for nationwide commercial use under the *Original Order*, the agency acted arbitrarily and capriciously by failing to process PLMRS's application at the same time. As the agency explains, however, it processed the commercial applications in 1993 because the rules promulgated in the *Original Order* to govern nationwide commercial licenses had become final and were not subject to further agency reconsideration. The Commission did not process the applications for nationwide noncommercial licenses in 1993 because there were pending before it three petitions for reconsideration of the rules governing assignment of those licenses. *See Notice: November 19, 1992, Date Established for Commercial Nationwide 220–222 MHz Band Applicants to File Application Amendments to Satisfy Entry Criteria,* 57 Fed.Reg. 49,475, 49,475 (1992). We see nothing arbitrary or capricious in the Commission's decision to defer issuing licenses until it has finally settled upon the rules for doing so. *See Chadmoore Communications v. FCC,* 113 F.3d 235, 242 (D.C.Cir.1997) (holding disparate treatment arbitrary only if parties are similarly situated).

■ PLMRS's final two contentions, made only in passing, may be rejected in kind; neither raises a question open in this circuit. First, PLMRS did not, by virtue of filing its application, obtain the right to have it considered under the rules then applicable. *See id.* at 241. Second, be-

cause PLMRS obtained no such right, the Commission's subsequent change in the regulations was not retroactive, let alone impermissibly retroactive, rulemaking. *See DIRECTV, Inc. v. FCC,* 110 F.3d 816, 825–26 (D.C.Cir.1997) (holding that because Commission's original order did not grant right to any particular broadcast channels, subsequent decision to auction those channels not retroactive though it upset expectations based upon prior law).

We therefore conclude that the Commission's decision to auction the licenses and to return PLMRS's application was neither arbitrary nor capricious.

B. Columbia's Challenge to the *Third Report and Order*

■ The Commission may not base a decision to designate a band of frequencies for a particular use upon "the expectation of Federal revenues from the use of a system of competitive bidding." 47 U.S.C. § 309(j)(7)(A). Columbia claims the Commission did just that, however, when it designated for commercial use the channels covered by the four licenses at issue in this case. For this it relies exclusively upon the videotape of a meeting at which the five-member Commission voted unanimously to approve the notice of proposed rulemaking that led a year and one-half later to the *Third Report & Order.* *See Second Memorandum Opinion and Order and Third Notice of Proposed Rulemaking,* 11 F.C.C.R. 188 (1995).

At that meeting two of the five Commissioners mentioned the expectation of federal revenues. Commissioner Susan Ness elicited from the Commission staff the estimate that proceeds of an auction would be "in the neighborhood of a quarter-billion dollars." She also commented that the 33 remaining original applicants "include some of the largest U.S. Companies— AT&T, UPS, GE to name a few. These national companies can afford to return to the U.S. taxpayer a little of the value of the spectrum." Chairman Reed Hundt stated, "I suppose we could hold an auc-

tion. I suppose we could hold a comparative hearing, too, . . . on the following basis. The one who wants to give us the most money wins the hearing." Columbia argues that these statements show the Commission violated § 309(j)(7)(A), that is, designated the licenses to commercial use based "principally, if not exclusively, [upon] the FCC's commitment to convert the nationwide 220 MHz spectrum into federal revenues."

The Commission claims it did not base its decision upon the expectation of revenues. It points out that the *Third Report and Order* makes no mention of such impermissible considerations, but rests solely upon legitimate justifications, such as promoting efficient nationwide communication services at reasonable prices, promoting the development of new technologies, and ensuring that licenses go to those who value them most. *See* 12 F.C.C.R. 10,943, ¶¶ 47, 202.

■ It is fundamental that "[a]gency opinions, like judicial opinions, speak for themselves." *Checkosky v. SEC,* 23 F.3d 452, 489 (D.C.Cir.1994). Rendered at the conclusion of all the agency's processes and deliberations, they represent the agency's final considered judgment upon matters of policy the Congress has entrusted to it. Accordingly, "[w]here an agency has issued a formal opinion or a written statement of its reasons for acting, transcripts of agency deliberations at Sunshine Act meetings should not routinely be used to impeach that written opinion." *Kansas State Network v. FCC,* 720 F.2d 185, 191 (D.C.Cir.1983).

■ We do not think the evidence that two Commissioners initially flirted with an impermissible rationale suffices to demonstrate that the permissible rationale given a year and one-half later in the Commission's published opinion was a mere pretext. Otherwise, it would seem, almost any slip of the tongue during an agency's decisionmaking process could be fatal, contrary to the settled principle that "[u]p to

the point of announcement, agency decisions are freely changeable, as are the bases of those decisions." *Checkosky*, 23 F.3d at 489.

Columbia next claims that Chairman Hundt prejudged the question whether to assign the licenses by auction. In August 1995, before the Commission issued the *Third Notice of Proposed Rulemaking*, the Chairman unveiled in a speech the Commission's "lineup of upcoming auctions," including the auction in the third quarter of 1996 of the licenses at issue here. The Washington Legal Foundation then petitioned the Commission requesting that the Chairman recuse himself from voting upon the auction issue on the ground that he would be unable to give meaningful consideration to the public comments opposing an auction and favoring a lottery. Chairman Hundt did not recuse himself, and indeed voted to adopt the *Third Report and Order*, as did all the Commissioners.

The day after the public release of that order Chairman Hundt responded to the WLF's petition. He explained that his 1995 statements indicated only his preliminary views, that his announcement of tentative auction dates "included all *potential* services to be licensed" by auction in 1996, and that the Commission must begin to plan for an auction "well in advance of any final Commission decision to authorize [one]." Letter from Chairman Hundt to Washington Legal Found. (March 13, 1997).

Generally, we are unable to view the motivations of an agency official except as through a glass, darkly, and the glass may be tinted not by the official's unalterable prejudgment but by legitimate policy preconceptions; in a particular instance, the cause may be exceedingly difficult to discern. In order to avoid trenching upon the agency's policy prerogatives, therefore, we presume that policymakers approach their quasi-legislative task of rulemaking with an open mind—but not an empty one.

*See Lead Indus. Ass'n v. EPA,* 647 F.2d 1130, 1179 (D.C.Cir.1980) ("Agency decisionmakers are appointed precisely to implement statutory programs, and so inevitably have some policy preconceptions"); *United Steelworkers of Am. v. Marshall,* 647 F.2d 1189, 1208 (D.C.Cir.1980) ("An administrative official is presumed to be objective [and] mere proof that [he or] she has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption").

Columbia's burden is to make a "clear and convincing showing that [Chairman Hundt had] an unalterably closed mind on matters critical to the disposition of the proceeding." *Association of Nat'l Adver. v. FTC,* 627 F.2d 1151, 1170 (D.C.Cir.1979). That it has not done. Even if we assume Chairman Hundt was predisposed in favor of auctions as a matter of policy, that alone would not imply that he was unwilling to consider arguments to the contrary.

In sum, Columbia has not shown that the Commission decided to auction the licenses based upon the impermissible expectation of federal revenues. Neither has it shown that Chairman Hundt should have disqualified himself because he had unalterably decided to vote for an auction even before the period for public comment had opened.

### III.  Conclusion

For the foregoing reasons, we reject the petitioners' challenge to the *Third Report and Order*. Because the *Third Report and Order* superseded the disputed portions of the *Reconsideration Orders, see* 12 F.C.C.R. 10,943, ¶ 6, their challenge to the *Reconsideration Orders* is moot. Accordingly, the petitions for review are

*Denied.*